On October 11, 1921, H. G. Carson, as guardian of Walker Blaine, an Osage minor Indian, filed a petition in the county court of Osage county, Okla., praying that letters of administration be issued to him on the estate of Lawrence Gray, deceased.
The petition was heard by the court on the 22nd day of October, 1921, whereupon the court made an order appointing petitioner administrator of said estate, and caused letters of administration to be issued as prayed for. Thereafter, to wit, on the 7th day of January, 1924, the administrator presented and filed his final account, praying the court for an order settling said account, and that the balance remaining in his hands after all debts and claims against the estate had been paid, be distributed to Walker Blaine as the sole surviving heir of Lawrence Gray, deceased.
On the 2nd day of January, 1924, the plaintiff in error, Josephine Gray James, flied in said court her plea of intervention, in which she claimed to be the surviving wife of Lawrence Gray, deceased, and, as such, entitled to have all of said estate distributed to her. The county court, on the 3rd day of March, 1924, entered an order approving the final account of H. G. Carson, administrator, finding Walker Blaine to be the sole heir of Lawrence Gray, deceased, and ordering the whole of said estate distributed to him.
An appeal was thereupon taken by the plaintiff in error to the district court of Osage county upon both questions of law and fact. On the 8th day of September, 1924, plaintiff in error filed, in the district court of Osage county, an amendment to her plea in intervention, in which she reiterated her claim as the surviving wife and heir of Lawrence Gray, deceased, alleging that she and Lawrence Gray, deceased, were duly and legally married in the state of Colorado in October, 1921, while maintaining their matrimonial residence in that state, and that said marriage was legal and valid under the laws of that state.
At the same time plaintiff in error filed a plea to the jurisdiction of the district court of Osage county, and a motion to dismiss the *Page 220 
cause for want of jurisdiction of the county court to appoint an administrator, and for want of jurisdiction of that court to determine the heirs of Lawrence Gray, deceased.
The matter came on for hearing in the district court of Osage county on the 8th of September, 1924, and on the 11th day of September, 1924, the district court rendered judgment affirming the judgment of the county court. From this judgment, and from an order overruling her motion for a new trial, plaintiff in error, Josephine Gray James, appeals to this court for review. For convenience plaintiff in error will hereafter be designated as intervener.
It appears that Lawrence Gray, a restricted Osage Indian, died at Colorado Springs, Colo., on the 10th day of October, 1921. At the time of his death he was under guardianship, having by the county court of Osage county, in the year 1919, been declared to be an incompetent person. On July 16, 1921, his guardian, E. H. Mattingly, had obtained an order from the county court of Osage county to conduct Lawrence Gray to Colorado Springs, and place him in a sanatorium for the treatment of tuberculosis and pellagra, and during the period of time intervening between that date and the date of his death, he was a patient in Knobhill Sanatorium in Colorado Springs.
Intervener was the owner of a rooming house in Pawhuska, Okla., and it appears that for some months prior to the time of his removal to Colorado Springs, Lawrence Gray had boarded with intervener in said rooming house. At the time of the removal of Lawrence to Colorado, intervener was the wife of one Columbus Walker, with whom she had intermarried in the year 1885, and she continued to be his legal wife until October 3, 1921, at which time she was granted a divorce by the district court of Osage county. Lawrence Gray had himself been divorced from a former wife, Edna Gray, a few months prior to this removal to Colorado Springs. He left surviving no issue, father, mother, brothers, or sisters.
The controversy arising in this case is between intervener, claiming to be the surviving wife of Lawrence Gray, deceased, and Walker Blaine, claiming to be a surviving nephew. The trial court found that Walker Blaine was the child of a deceased sister of Lawrence Gray, and if the trial court did not err in finding and concluding that intervener was not the surviving wife of Lawrence Gray, we think, under the evidence, it was fully justified in concluding that Walker Blaine was the sole surviving next of kin and entitled to inherit the estate of Lawrence Gray under the provisions of subsection 6, section 11301, C. O. S. 1921.
It may be stated here that the principal question argued and discussed by the parties, in both the oral argument and the briefs filed in the case, was whether or not matrimonial relations existed between intervener and Lawrence Gray at the time of his death on October 10, 1921, but before we give consideration to this matter it is proper that we notice the contention of intervener that the county court of Osage county was without jurisdiction to appoint an administrator of Lawrence Gray, or to determine his heirs, and that for this reason this court should remand the cause, with directions to dismiss the proceeding.
It is insisted that Lawrence Gray was a resident of the state of Colorado at the time of his death, and that therefore the county court of Osage county had no jurisdiction to appoint an administrator to administer his estate. The evidence discloses very clearly, we think, that the residence of Lawrence Gray continued to be in Osage county, Okla., until the time of his death, unless it was changed by the act of his guardian in removing him to Colorado for his health. He had always maintained his residence in said county, and by the order appointing E. H. Mattingly his guardian, as well as by the order subsequently entered appointing H. G. Carson as administrator of his estate, his residence had been judicially determined to be in Osage county, Okla.
These circumstances at least raise a presumption of fact that Lawrence Gray died a resident of Osage county, Okla. Anthis v. Drew et al., decided Oct. 20, 1925, pending on rehearing, 39 Okla. App. Ct. Rep. 290.
Section 6587, C. O. S. 1921, provides:
"A guardian of the person is charged with the custody of the ward, and must look to his support, health and education. He may fix the residence of the ward at any place within the state, but not elsewhere, without permission of the court."
There is nothing to be found in the order of the county court of Osage county, authorizing the guardian to place Lawrence Gray in a sanatorium at Colorado Springs for his health, which may be construed as a permission by the county court to establish the residence of Lawrence Gray in Colorado.
The language of the order negatives this construction. The order referred to authorized the guardian to place Lawrence Gray *Page 221 
in a sanatorium for treatment of tuberculosis. There was nothing in the order authorizing the guardian to purchase or rent a home for Lawrence in Colorado, or any language which could be construed as permission and authorization by the court to establish a residence for him in Colorado, and while it might be true, under some circumstances, that a change of residence might legally result from the location of a party in a certain locality for his health, the mere placing of a party temporarily in a sanatorium for this purpose could not have this result, in the absence of further testimony that after leaving the sanatorium he intended to continue his sojourn in more permanent surroundings.
We think the trial court was fully justified, under the evidence, in finding that Lawrence Gray was a resident of Osage county at the time of his death, and that the county court of Osage county therefore had jurisdiction to appoint an administrator of his estate. This brings us to the vital question for determination in this case, to wit, Did the relation of husband and wife exist between intervener and Lawrence Gray at the time of his death on October 10, 1921?
It is the contention of intervener that a marriage per verba de praesenti was entered into between her and Lawrence Gray at Knobhill Sanatorium in the city of Colorado Springs, Colo., on the 6th day of October, 1921, of which the element of cohabitation, or what is known as "habit and repute," formed no part, and they cite numerous authorities, including the Colorado and Oklahoma courts, which apparently sustain the proposition. She contends that at this time the minds of the parties met in a common consent to immediately assume matrimonial relations. However, the question here is not so much the elements of the marriage, but whether any marriage, in fact, ever took place. There was no written contract of marriage signed by the parties at the time, evidencing their common purpose to immediately enter the matrimonial state.
No witness to the alleged marriage was produced. One of the principals to the marriage contract died on the 10th day of October thereafter, and the surviving party to the contract, the intervener herein is the only witness appearing in this record undertaking to testify as to the language of the marriage contract. The substance of her testimony in this particular was, that after reporting to the deceased, Lawrence Gray, that she had been unsuccessful in obtaining a marriage license from the court clerk, and after having made two visits to the clerk's office or the purpose of obtaining a marriage license, Lawrence Gray stated: "We can get married without a license. All the courts and nurses can't keep us from being man and wife. You are my wife, are you?" and she said: "Yes." It is contended that the instant these words were uttered Lawrence Gray and intervener became husband and wife, and bound to themselves and to society as such.
It is the contention of defendants in error that this alleged contract never took place, and the trial court so found.
Let us review the record in this case with a view of determining whether the trial court was justified in so finding. It must be borne in mind, that at the time of the alleged contract of marriage the deceased, Lawrence Gray, was practically bedfast, suffering from a complication of tuberculosis and pellagra; that in the year 1919 he had, by the county court of Osage county, been declared to be an incompetent person, and placed under guardianship, and that about three months prior to the alleged marriage, to wit, July 16, 1921, his guardian had obtained an order from the county court of Osage county to conduct Lawrence Gray to Colorado Springs, Colo., and place him in a sanatorium for treatment, and that acting under this order the guardian did on or about the 16th of July, 1921, place Lawrence Gray in the Knobhill Sanatorium in Colorado Springs, where he remained under the constant care and attention of a physician by the name of Dr. McCorkel, and during a part of the time, of a special nurse by the name of Abbie Putnam, until his death on the 10th of October, 1921.
We have already found that notwithstanding the removal of Lawrence Gray to the Knobhill Sanatorium in Colorado Springs for treatment, his legal residence remained in Osage county, Okla. It will thus be seen that the purpose in view by the county court of Osage county, and of the guardian of Lawrence Gray in removing him to Colorado, was that he might receive treatment for tuberculosis in a sanatorium especially equipped for that purpose in a suitable climate. There was no thought by anyone charged with legal responsibility for the welfare of Lawrence Gray, that he was being removed to Colorado for the purpose of carrying out any matrimonial project, or any other enterprise personal to himself other than that he should receive treatment for the disease from which he was suffering. *Page 222 
The right of intervener to marry Lawrence Gray, even while he was confined in a sanatorium for his health, may not be questioned, and the parties had the undoubted right to go to Colorado for the purpose of solemnizing the marriage under the laws of Colorado, and undoubtedly a marriage so consummated would be regarded as valid everywhere, so long as it did not amount to a fraud on the laws of the state of the domicile of the parties, but in view of the situation of Lawrence Gray at the time of the alleged marriage contract, and of the peculiar relationship sustained by him to his guardian and those charged with his welfare, we doubt if a contract of marriage could be consummated without the knowledge of those having him in their immediate care.
The alleged correspondence passing between intervener and Lawrence Gray, after his removal to Colorado Springs and prior to the alleged marriage on the 6th day of October, 1921, has been emphasized in the argument by the parties in their briefs. In this connection it is well to observe that the record discloses that intervener, on July 2 1921, filed an application in the district court of Osage county for a divorce from her former husband, Columbus Walker, and that the final decree in this divorce action had not been rendered until October 3, 1921. The contents of some of this correspondence was admitted in evidence upon proof that the original letters had been lost or destroyed.
In the correspondence referred to, it is claimed that an engagement to marry was entered into between intervener and Lawrence Gray on the 15th of August, 1921, but that by reason of some delay in the divorce proceeding, whereby intervener was prevented from obtaining her divorce until October 3, 1921, the date of the marriage had to be postponed.
This is not a case where the parties, all prior marriages having been dissolved, remove to another state, there to consummate the marriage in accordance with the laws of that state, for we have already observed that one alleged contracting party had previously been removed to the foreign state for an entirely different purpose, and in view of the apparent legal disability of intervener, by reason of the subsistence of the prior undissolved marriage, to enter into an engagement to marry another party in the future, we are disposed to give little value to this correspondence as evidence of any act of marriage subsequently entered into between the parties.
On cross-examination intervener testified in answer to a question propounded by counsel as follows:
"I will ask you if it wasn't a fact, Mrs. James, that the business you had referred to in your letter you had to close, before you could come out, was this divorce? A. That was part of it."
The divorce was granted on October 3, 1921, and intervener left for Colorado on the following day. We think the reasonable inference to be drawn from this conduct on the part of intervener was that her prior marriage with Columbus Walker had not been dissolved by his death, or by a divorce granted on his application, and where the subsequent marriage is attacked, as it is in the case at bar, the presumption of removal of prior obstacles in support of the marriage does not obtain in the absence of proof on the part of intervener to overcome the inference of fact arising from her conduct in seeking a divorce. Brokeshoulder v. Brokeshoulder, 84 Okla. 249,204 P. 284; Page v. Roddie et al., 92 Okla. 236, 218 P. 1092,
We are compelled then to view the intervener as she appeared on the scene in Colorado Springs on October 5, 1921, for the first time seeking marriage with Lawrence Gray without any valid engagement therefor; whatever legitimate engagement to enter into marriage relations with Lawrence Gray must have been formed subsequently to that time, if, in fact, any engagement was entered into at all.
It is not to be disputed that intervener, at the time of her arrival in Colorado Springs on October 5, 1921, was eager to enter into marriage relations with Lawrence Gray at the earliest possible moment. We have already observed that the marriage contemplated by intervener was not such a marriage as might have been entered into between herself and Lawrence Gray in Colorado for the purpose of making the marriage valid under the laws of Colorado, notwithstanding the statute of Oklahoma forbidding marriage of a divorced spouse within six months after the divorce decree, for the reason that Lawrence Gray was not in Oklahoma at the time the divorce decree of intervener was granted, and hence could not have been a party to such a contract or engagement to marry. Neither was the marriage contemplated by intervener one of those sentimental marriages sometimes consummated between sweethearts when one of the contracting parties is near death. She obviously did not go to Colorado to marry Lawrence Gray and remain with him until his death, *Page 223 
for she immediately, or soon after the marriage, returned to Oklahoma. Yet the record we think clearly sustains the conclusion that intervener was desirous of entering matrimonial relations with Lawrence Gray as soon as possible. She appeared at the sanatorium and made known her intentions to Miss Standish, the proprietress of the institution where Lawrence Gray was staying. There was nothing in her conduct at the time to indicate that she desired to enter into marriage relations with Lawrence Gray secretly. She testified that both of them desired to marry at once according to the statute laws of Colorado, and that at the request of Lawrence Gray she, on the next day after her arrival, repaired to the office of the proper authority to obtain the marriage license; that she was required under the laws of Colorado, if one or both of the contracting parties had been divorced, to state the grounds on which the divorce had been granted, and that being unable to furnish this information, she returned to the bedside of Lawrence and obtained the desired information for the license clerk, but in the meantime someone had lodged a protest with the Colorado authorities, and after waiting a few minutes in the office for the chief clerk to return, she came back to the bedside of Lawrence, where the marriage was carried out as stated above. She further testified that at Lawrence Gray's request she sought the aid and assistance of the nurse in obtaining someone to go to the courthouse for the license, and that she mentioned the need of obtaining a minister, or someone else legally authorized to perform the ceremony. These circumstances indicate clearly to our minds that intervener not only contemplated an early marriage but also a public marriage. Up to the time of the refusal of the Colorado authorities to issue a license because of the protest referred to, there had been nothing on the part of intervener to indicate other than that she desired an open public marriage, whatever the form of the marriage might be.
We should naturally expect in this state of the proceedings to have the fullest corroboration by those in immediate charge of Lawrence Gray at the sanatorium in which he was staying. Miss Standish, the owner and proprietress of the sanatorium, testified that upon the arrival of intervener she assigned her a room in a bungalow not occupied by Lawrence Gray, and that so far as she knew she continued to occupy this apartment until she returned to Oklahoma on Sunday, October 9, 1921. If the marriage had occurred on the 6th day of October, as detailed by the intervener, and there appeared to be no desire on the part of intervener to consummate the marriage secretly, it would seem natural that intervener should have notified Miss Standish of her marriage, and that she was vacating the apartment which had theretofore been assigned to her. Not only was this not done, but so far as this record discloses, she maintained the same general attitude toward the institution and its employees that she had maintained prior to the time of the alleged marriage. Especially should we expect the fullest corroboration by the special nurse in charge of Lawrence, whose duty it was to remain with him at all times, both day and night. Yet the special nurse testified that, to the best of her knowledge, intervener did not occupy the same room with Lawrence Gray at any time after the alleged marriage.
Dr. McCorkel, the physician in charge of Lawrence Gray, and who visited him daily, testified that nothing had been brought to his attention to indicate a marriage between his patient and intervener; that intervener appeared to be kind to Lawrence on the occasion of his visits. Not only is there an absence of corroboration by those in immediate charge of Lawrence Gray as to the fact of the alleged marriage, but the testimony of intervener respecting Lawrence Gray's consent to the marriage is flatly contradicted by Miss Standish, the proprietress of the sanatorium. Miss Standish testified that, having learned in a conversation with intervener that she contemplated marriage with Lawrence, she immediately interviewed Lawrence about the matter, and that he informed her that he did not want to marry intervener or any other woman, and requested her to interfere — that intervener was annoying him — and she thereupon telephoned a protest to the authorities at the courthouse, and that soon thereafter intervener returned to Oklahoma.
In the same connection Dr. McCorkel testified that he interrogated Lawrence in regard to his proposed marriage to intervener and that Lawrence gave him no answer. He also testified that he had some conversation with intervener in regard to the proposed marriage, and advised that Lawrence was a very sick man, and that he was going to die and would never be moved from the sanatorium. It is true that the special nurse, Miss Putnam, testified in effect that on the day following the arrival of intervener she heard some conversation between the intervener and Lawrence, in reference to some business at the courthouse, in which the *Page 224 
nurse directed intervener how she could find the courthouse, and that upon her return she heard some further discussion concerning the reason why the license had not been issued, in which Lawrence advised intervener the ground on which the divorce from his former wife had been granted. She further testified that she subsequently heard intervener and Lawrence discuss something about moving to themselves and renting a house for this purpose, and that in this connection Lawrence asked the witness if she would go with him and continue to take care of him, to which she consented, but she also testified that Lawrence was very sick, and that at other times he expressed considerable dislike for intervener, and that from the general conduct and situation of the parties she could not determine whether they were married or not, though they sometimes acted like they were married.
The testimony of the special nurse must be weighed in connection with an expressed dislike of Lawrence for intervener manifested on other occasions, and of his abnormal physical and mental condition at the time. Dr. McCorkel testified that during the last week of his illness, Lawrence Gray was unconscious or delirious about half of the time. It must be weighed in connection with the further fact that intervener was alert and in full possession of her faculties, and when so considered, this testimony is not, we think, inconsistent with the theory of defendants in error that Lawrence Gray did not openly consent to form matrimonial relations with intervener.
If there was a marriage per verba de praesenti actually entered into between Lawrence Gray and intervener at this time, we think it indeed singular that such marriage would be wanting in corroboration by those whose opportunities for knowing of the precise matters of fact in dispute should have enabled them to testify in relation thereto. The conduct and declarations of intervener subsequent to the alleged marriage corroborate the theory of defendants in error. According to Dr. McCorkel she was advised that Lawrence Gray was a very sick man and could live but a short time, yet she left Colorado Springs on October 9, 1921, and before her arrival in Pawhuska Lawrence Gray was dead. We regard this conduct as entirely inconsistent with the relationship of husband and wife. It is true that she attempted to explain this conduct by saying that she had some business to transact in Oklahoma, but it appears that this business, whatever may have been its nature, was not transacted.
The record discloses that in December, 1921, she filed a claim with the present administrator of the estate of Lawrence Gray for the sum of $16.50, under the name of Josephine Walker, and this claim was subsequently paid by check made payable to Josephine Walker. Her conduct and declaration in this respect was inconsistent with the relationship of husband and wife. It is true that if the estate of Lawrence Gray owed her money, she had a right to file a claim against the estate, but it is singular that she should file a claim against an estate of which she claimed to be the sole owner and beneficiary as surviving wife under the name of Josephine Walker.
In 1922 the record discloses that she married in Joplin, Mo., a man by the name of Roy James, the license authorizing this marriage having been issued in the name of Josephine Walker. Letters of administration were issued upon the estate of Lawrence Gray in October, 1921, and it was not until the early part of 1924 that she intervened in the proceeding and asserted any claim to the estate of Lawrence Gray, as his surviving wife, in the Oklahoma courts. We think all of this conduct is inconsistent with the relationship of husband and wife. It is true that several witnesses testified on behalf of intervener in relation to certain acts and declarations of Lawrence Gray in holding the intervener out as his wife at Colorado Springs, prior to the time that intervener left for Oklahoma, but these witnesses were for the most part strangers to both Lawrence Gray and intervener, unfamiliar with the circumstances surrounding the parties at the time of the alleged marriage.
Furthermore, most of these witnesses testified to alleged statements and declarations of Lawrence Gray while he was subject, to periods of delirium, and while in the immediate presence of intervener, and for the reasons hereinbefore set out, we do not think the testimony of these witnesses should be permitted to outweigh the testimony of those having the immediate charge of Lawrence Gray, and whose opportunities, therefore, for knowing of the primary matter in issue must have been superior to those of the witnesses relied on by intervener.
The guardian of Lawrence Gray and Dr. McCorkel both testified that the conversations they had with Lawrence Gray, after his removal to Colorado Springs, related to his former wife, Edna, rather than to intervener, and that during this time Lawrence Gray had expressed a fondness for her, and *Page 225 
had on one occasion stated to Dr. McCorkel that he had made a will disposing of all his property to her.
After a careful review of the entire record and evidence, we think the trial court was fully justified in finding and concluding that Lawrence Gray and intervener did not enter into matrimonial relations, and that she therefore was not entitled to inherit any portion of his estate. We think the judgment of the trial court should be affirmed.
By the Court: It is so ordered.